UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
MICHAEL MILTENBERG,

                   Plaintiff,

        -against-

ANDREW SAUL,[1]

                  Defendant.
------------------------------------------------------------------X

For Online Publication Only

**MEMORANDUM & ORDER**
17-CV-7199 (JMA)

**APPEARANCES**

      Christopher James Bowes
      Law Office of Christopher James Bowes
      54 Cobblestone Drive
      Shoreham, NY 11786
      *Attorney for Plaintiff*

      Jason Peck
      United States Attorney's Office, EDNY
      271 Cadman Plaza East, 7th Fl
      Brooklyn, NY 11201
      *Attorney for Defendant*

**AZRACK, United States District Judge:**

      Plaintiff Michael Miltenberg ("Plaintiff") seeks review of the final determination by the Commissioner of Social Security (the "Commissioner"), reached after a hearing before an administrative law judge ("ALJ"), denying Plaintiff disability insurance benefits under the Social Security Act. The case is before the Court on the parties' cross-motions for judgment on the pleadings. For the reasons discussed herein, Plaintiff's motion for judgment on the pleadings is DENIED, and the Commissioner's cross-motion is GRANTED.

---

[1] Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew Saul is substituted for Acting Commissioner Nancy A. Berryhill as the defendant in this suit.

# I.    BACKGROUND

## A.  Procedural History

On December 28, 2011, Plaintiff filed for disability insurance benefits with the Social Security Administration ("SSA"), alleging disability as of April 13, 2011, due to cervical degenerative disc disease, bilateral shoulder degenerative joint disease, and right knee pain.  (Tr. 93-94.)  Following denial of his claim, Plaintiff requested a hearing and appeared with his attorney for an administrative hearing before Administrative Law Judge Andrew S. Weiss ("ALJ Weiss") on May 15, 2013.  (Tr. 21-40.)  In a decision dated June 15, 2013, the ALJ denied Plaintiff's claim, finding that he was not disabled.  (Tr. 7-20.)  On October 10, 2014, the Appeals Council denied Plaintiff's request for review of the ALJ's decision.  (Tr. 1-6.)  Plaintiff appealed the ALJ's decision to this Court, and, by stipulation and order on June 5, 2015, the Court remanded the case to the Commissioner for further administrative proceedings.  (Miltenberg v Colvin, 14-CV-7183-JMA; Tr. 364-72.)

On remand, Plaintiff appeared, represented by counsel, at a June 7, 2016 administrative hearing before ALJ Weiss.  (Tr. 335-63.)  On July 19, 2016, ALJ Weiss found Plaintiff was not disabled because he still retained the residual functional capacity ("RFC") to perform light work that includes the ability to sit and stand/walk six hours each in an eight-hour workday with normal breaks, and lift/carry ten pounds frequently and twenty pounds occasionally.  Further, Plaintiff could frequently climb and balance, occasionally stoop, kneel, and crouch, never crawl, frequently push/pull, frequently reach with the dominant right upper extremity and occasionally reach with the upper left extremity.  (Tr. 323-34.)  ALJ Weiss determined that Plaintiff is capable of performing his previous employment as a police lieutenant and that there are also other jobs that exist in the national economy that he can perform.  (Tr. 327-29.)  ALJ Weiss's July 19, 2016

decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on October 5, 2017. (Tr. 311-15.) This appeal followed.

**B.  Plaintiff's Background and Testimony**

Plaintiff was born in May 1969. (Tr. 93.) He graduated high school, attended but did not graduate from college, and graduated from the police academy. (Tr. 339-40.) From 1990 through April 2011, Plaintiff worked for the New York City Police Department and last worked as a police lieutenant. (Tr. 36, 134.) He had not worked since April 2011 due to various work-related injuries, including from a motor vehicle accident that required surgery on his shoulder. (Tr. 37-38, 340-41.) Plaintiff tried to return to work after the surgery, but was unsuccessful. (Tr. 340-41.) The New York City Police Department's Medical Board (the "Medical Board") eventually found him disabled and he was "forced to retire." (Tr. 341.)

As part of his application for disability insurance benefits, Plaintiff filled out a function report, dated April 20, 2012. (Tr. 122-33.) Plaintiff stated that he cannot sleep due to pain and has problems with personal care because it causes pain and takes a long time. (Tr. 123-24.) He cannot carry anything. (Tr. 124.) He walks and goes outside when he is feeling up to it. (Tr. 125.) He can only drive short distances and does not shop because it is too painful. (Tr. 126.) He reads and watches television each day. (Tr. 126.) He stated that he is unable to do woodwork, ride a motorcycle, surf, or swim anymore and used to be more social but is not anymore due to his pain. (Tr. 127.) Lifting is painful and he cannot stand, walk, or sit "for long." (Tr. 127-28.) He can climb the stairs slowly and it is painful, cannot reach overhead, and has problems with his left hand. (Tr. 128.) When kneeling or squatting, his knee sometimes goes out. (Id.) He stated that he has pain in his neck, back, shoulders, and left hand and the pain spreads down his left arm. (Tr. 131.) He feels pain constantly and moving around or sitting for a long time causes pain. (Id.)

3

Plaintiff testified at the May 15, 2013 hearing and June 7, 2016 hearing.  At the June 7, 2016 hearing, Plaintiff testified that he lived with his wife, who cares for him, and children.  (Tr. 341.)  He takes pain medication twice a day and uses a TENS machine.  (Id.)  He rarely drives a car, testifying that side effects from the pain medication prohibited him from driving.  (Tr. 342-44.)  Plaintiff testified that he experienced pain in his neck, which caused "seizures" or spasms from his neck to his hand daily.  (Tr. 343-45.)  He uses Voltaren gel to numb the pain and "break the spasm."  (Tr. 343.)  He testified that he has a constant dull pain in his back and has pain and weakness in his right knee causing it to buckle and twice fall down the stairs of his house.  (Tr. 354.)  He testified that he would not be able to perform a job where he was required to look at a security monitor and buzz people in because the use of his arms would cause pain and provoke a seizure.  (Tr. 345-46.)  He is unable to reach overhead without pain and spasms in his shoulders and arms.  (Tr. 346.)  He testified that he is righthanded.  (Tr. 356.)  At the 2013 hearing, Plaintiff testified that an EMG or nerve test was performed but "they couldn't finish the test because I have a bleeding disorder."  (Tr. 32-33.)

## C. **Medical Evidence**

### 1. **New York City Police Department's Medical Board**

On May 5, 2009, Plaintiff was in a motor vehicle accident while working as a police lieutenant and injured his left shoulder.  Plaintiff underwent physical therapy and on August 24, 2010 had surgery on his left shoulder (left shoulder repair of rotator cuff, decompression for impingement syndrome, debridement for partial labral tear, and glenohumeral synovectomy).  (Tr. 248-250.)  A June 13, 2011 examination by the Medical Board showed "significant orthopedic findings precluding the lieutenant from performing the full duties of a New York City Police Officer" and recommended approval of Plaintiff's application for "Accident Disability

Retirement" and disapproval of the Police Commissioner's application for "Ordinary Disability Retirement." (Tr. 251.)  The Medical Board diagnosed Plaintiff with status post rotator cuff, labral tear and untreated acromioclavicular separation on the left side.  (Id.)  The Medical Board noted that the "findings are permanent and chronic" and "the competent causal factor is the line of duty injury of May 5, 2009."  (Id.)

### 2.  Dr. Mitchell Goldstein—Orlin & Cohen Orthopedic Associates, LLP

On August 20, 2011, Dr. Goldstein examined Plaintiff for complaints of left shoulder pain, restricted range of motion with his left shoulder, popping in his right shoulder, sharp pain from his neck to his left arm, with tingling and locking of his left fingers, constant and dull localized pain in his lower back, and instability in his right knee.  (Tr. 276.)  Dr. Goldstein noted that Plaintiff had tried physical therapy and also had Von Willebrand's Disease, which affected his blood-clotting ability.  (Id.)  On examination, Dr. Goldstein found that Plaintiff's right knee was tender, flexion and abduction of the left shoulder were limited to 90 degrees, with pain at the endpoints of motion, and forward flexion of the neck was limited to 20 degrees and extension to 5 degrees.  (Tr. 277.)  Plaintiff had left arm weakness and altered sensation of the left upper extremity.  (Id.)  An x-ray of the cervical spine showed straightening consistent with spasm and disc space narrowing as well as anterior calcification at C5-6.  (Id.)  An x-ray of the right knee showed "mild narrowing." (Id.)  X-rays of the shoulders showed no fractures, subluxations, dislocations, or significant abnormalities.  (Id.)  Dr. Goldstein diagnosed cervical radiculopathy, cervicalgia, degenerative disc disease of the cervical spine, neck pain, myositis, lumbago, lumbar pain, knee pain, internal derangement of the knee joint, chondromalacia, shoulder pain, and adhesive capsulitis.  (Id.)

Dr. Goldstein referred Plaintiff for a nerve conduction study and EMG conducted on September 27, 2011 by Steven Adler, MD, of Orlin & Cohen Orthopedic Associates, LLP, which

5

showed "normal latencies, aptitudes, and conduction velocities" as well as "no evidence of electrical instability" in all examined muscles.  (Tr. 184-85.)  Dr. Adler's impression was that it was a "normal left upper extremity/cervical electrodiagnostic study."  (Id.)  Dr. Adler's report indicates that he had advised Plaintiff of all risks including bleeding and infection prior to the procedure and the report contains no indication that the tests were stopped or incomplete.  (Id.)

Dr. Goldstein also referred Plaintiff for MRIs of the cervical spine, right shoulder, right knee, and left shoulder.  (Tr. 182, 253-55.)  A September 27, 2011 cervical MRI performed by Linda Harkavy, MD, also of Orlin & Cohen Orthopedic Associates, LLP, showed: "small posterior herniations from C3-4 through C6-7 without cord impingement. There is mild bony narrowing of the left neural foramina at C5-6 and C6-7."  (Id.)  A September 27, 2011 MRI of the right shoulder showed: "[t]iny (1-2 mm) partial thickness tear along the inferior margin of the supraspinatus tendon."  (Tr. 255.)  A November 10, 2011 MRI of the right knee showed small joint effusion and mild chondromalacia patella.  (Tr. 253.)  A November 10, 2011 MRI of the left shoulder showed: Plaintiff "appears to be status/post previous rotator cuff repair and acromioplasty. There appears to be a tear of the anterior infraspinatus. The remaining rotator cuff tendons are intact" and "[s]mall subacromial bursal fluid collection."  (Tr. 254.)  Dr. Harkavy also noted that "no labral tear is demonstrated. The glenoid rim is smooth. There is mild acromioclavicular joint arthrosis."  (Id.)

From November 2011 through October 2012, Plaintiff saw Dr. Goldstein several times for neck pain, elbow pain, and knee buckling.  (Tr. 265-72.)

On April 9, 2013, Dr. Goldstein completed a form entitled "Treating Doctor's Patient Functional Assessment to do Sedentary Work." (Tr. 263-64.)  Dr. Goldstein reported that Plaintiff could: stand and/or walk for less than two hours in an eight-hour workday; sit for less than 4 hours in an eight-hour workday; lift and/or carry more than 5 pounds but less than 10 pounds for a total

of up to 1/3 of an eight-hour workday; and lift and/or carry less than 5 pounds for a total of up to 2/3 of an 8-hour workday.  (Tr. 263.)  Dr. Goldstein also reported that Plaintiff suffers from pain which prevents him from performing 8 hours of work, has environmental restrictions due to physical limitations or sensitivity, requires periods of bed rest during the workday, requires frequent breaks during the workday, requires medications that interfere with his ability to function in the work setting, would have difficulty concentrating on his work, and requires an average of two or more sick days of each month.  (Tr. 264.)  Dr. Goldstein added that Plaintiff "is totally disabled - unable to work in any capacity due to consistent and severe pain, weakness, swelling, fatigue, tenderness, diminished range of motion, and diminished ambulation." (Id.)  On April 21, 2013, Dr. Goldstein assessed that Plaintiff remained "permanently and totally disabled."  (Tr. 305-09.)

On February 18, 2016, Dr. Goldstein examined Plaintiff and noted that he had neck and joint pain, but no back pain.  (Tr. 503.)  Examination of the left shoulder showed tenderness and pain on movement, flexion to 100 degrees, active abduction to 95 degrees, internal rotation to "sacrum degrees," external rotation with arm to side to 10 degrees, with diminished abduction and extension.  (Tr. 504.)  Range of motion was limited secondary to moderate pain at the end of the range of motion.  (Id.)  Plaintiff had (5-/5) strength in his left shoulder. (Id.)  Examination of the neck showed tenderness and pain on range of motion with stiffness at extreme flexion, extension, rotation to the right, and rotation to the left.  (Id.)  Forward flexion was 20 degrees, extension was 5 degrees, left lateral flexion was 5 degrees, right lateral flexion was 5 degrees, right lateral rotation was 45 degrees.  (Id.)  Plaintiff's left arm was weak and had altered sensation at times.  (Id.)  Strength in the left arm was 4/5.  (Tr. 505.)  Examination of the right knee showed tenderness and

Plaintiff had extension to 0 degrees, flexion to 125 degrees, and squat 0-90 degrees with pain.  (Id.)
Range of motion was 5-/5 and he had a non-antalgic gain, with a limp "at times."  (Id.)

On June 6, 2016, Dr. Goldstein completed the "Treating Doctor's Patient Functional
Assessment to do Sedentary Work" form again with the same answers as the previous form.  (Tr.
544-45.)

### 3.   Dr. Marc Parnes, D.O.—Family Practice Specialist

Dr. Parnes examined Plaintiff on September 22, 2011, for complaints of bilateral shoulder
pain, low back pain, and a right knee injury.  (Tr. 198.)  Dr. Parnes noted that Plaintiff had Von
Willebrand's Disease.  (Id.)  Dr. Parnes found that Plaintiff's left shoulder anterior flexion was
limited to 90 degrees (out of 180 degrees) and 120 degrees in the right shoulder.  (Id.)  Dr. Parnes
diagnosed "cervical and lumbar spinal sprains strain," "left and right shoulder spr[ai]ns," and
"right knee sprain, strain."  (Id.)  From November 2011 through January 2013, Plaintiff saw Dr.
Parnes several times.  Dr. Parnes recommended physical therapy, Tramadol, and Ambien.  (Tr.
199, 200, 297-301.)

On March 28, 2013, Dr. Parnes completed the "Treating Doctor's Patient Functional
Assessment to do Sedentary Work" form and reported the same answers as Dr. Goldstein.  (Tr.
289-294.)  On May 1, 2016, Dr. Parnes issued the same assessment except that lifting 2/3 of the
day was more than 5 pounds, but less than 10 pounds, and Plaintiff could occasionally use his left
and right upper extremities to reach overhead, reach forward, reach laterally, handle, finger, and
feel.  (Tr. 507-08.)  Dr. Parnes also noted that Plaintiff was disabled since April 13, 2011.  (Id.)

### 4.   Dr. Neil Kirschen—Pain Management Center of Long Island

From September 2011 through February 2013, Plaintiff saw Dr. Kirshcen with complaints
of neck, shoulder, and knee pain, and reduced range of motion in the left shoulder.  (Tr. 279-82,

286-87.)  Dr. Kischen diagnosed Plaintiff with cervical radiculopathy and enthesopathy.  (Tr. 282.)  Dr. Kirschen recommended using Lyrica and Voltaren gel and noted that Plaintiff was unable to get injections due to Von Willebrand Disease.  (Id.)  Dr. Kirschen noted that the medications provided "good relief."  (Tr. 279.)

On March 30, 2013, Dr. Kirschen completed the "Treating Doctor's Patient Functional Assessment to do Sedentary Work" form and reported that Plaintiff could: stand and/or walk for less than two hours in an eight-hour workday; sit for less than 4 hours in an eight-hour workday; lift and/or carry more than 5 pounds but less than 10 pounds for a total of up to 1/3 of an eight-hour workday; and lift and/or carry less than 5 pounds for a total of up to 2/3 of an 8-hour workday. (Tr. 258.)  Dr. Kirschen also reported that Plaintiff "suffers with pain which prevents [him] from performing 8 hours of work" and "has environmental restrictions due to physical limitations or sensitivity."  (Tr. 259.)  Dr. Kirschen noted that Plaintiff also had hypertension and was not a candidate for "interventional pain management procedures" due to Von Willebrand's disease.  (Tr. 260-261.)

### 5. Dr. Jerome Caiati—Consultative Examiner

On March 23, 2012, Dr. Jerome Caiati performed a consultative internal medicine examination of Plaintiff.  (Tr. 201-04.)  Plaintiff reported that he was unable to cook, clean, do laundry, go shopping, or take care of his children because of his back, neck, and left arm pain.  (Tr. 201.)  He was able to shower, dress himself, watch television, listen to the radio, and go out to doctor's appointments. (Id.)  Dr. Caiati found that Plaintiff had a normal gait and stance, could walk on his heels and toes without difficulty, perform a full squat while holding the table, needed no help changing for the examination or getting on and off the examination table, and was able to rise from a chair without difficulty.  (Tr. 202.)  The cervical spine showed flexion of 30 degrees,

extension of 30 degrees, lateral flexion of 10 degrees, and rotation of 60 degrees, with complaints of cervical pain. (Tr. 202.)  The lumbar spine showed flexion of 60 degrees, extension of 10 degrees, lateral flexion of 20 degrees, and rotation of 30 degrees, with complaints of low back pain. (Tr. 202.) There was full range of motion in the elbows, forearms, and wrists. (Tr. 202-03.) Right and left shoulders abducted to "90 degrees creating pain." (Tr. 203.)  Range of motion in the knees was right and left 0 to 150 degrees. (Tr. 203.)  Strength was full (5/5) in the upper and lower extremities and no muscle atrophy was evident. (Id.)  Dr. Caiati diagnosed obesity, hypertension with blood pressure slightly elevated, history of cervical herniated disks, history of right rotator cuff tear, history of left rotator cuff repair, history of lumbar herniated discs, and right knee pain.  (Id.)

Dr. Caiati found that Plaintiff was unrestricted in sitting, standing, and walking; Plaintiff had "minimal to moderate limitation right and left arms due to right and left shoulder pain" in reaching, pushing, and pulling; Plaintiff had a mild limitation in bending due to low back pain; was unrestricted in climbing; and had a moderate limitation lifting due to cervical right and left shoulder and low back pain.  (Tr. 204.)

### 6.  Dr. John Parker—Medical Expert

At the June 7, 2016 administrative hearing, Dr. Parker, an orthopedic surgeon, testified as a medical expert. (Tr. 346-54.)  Dr. Parker considered Plaintiff's medical records. (Tr. 346-54.) Dr. Parker testified that Plaintiff had cervical spine degenerative disc disease, degenerative joint disease, right shoulder impingement syndrome, and status-post left rotator cuff decompression surgical repair. (Tr. 347.)  Dr. Parker stated that the impairments did not meet or equal a listed impairment. (Id.)  Dr. Parker testified that Plaintiff could perform "light work" meaning that he could lift and carry lift and carry 10 pounds frequently and up to 20 pounds an occasionally; could

sit, stand, and walk for seven hours; could occasionally reach overhead with the left shoulder and frequently reach overhead with the right shoulder; was able to push and pull frequently; could frequently climb ladders, scaffolds, and was able to stoop and bend; and could occasionally crouch, but never crawl.  (Tr. 347-48.)  On cross-examination, Dr. Parker testified that he had reviewed Dr. Parnes and Dr. Goldstein's reports.  (Tr. 348-51.)  Dr. Parker testified that "the picture that is painted by the objective evidence is the bread and butter type degenerative changes that a general orthopedic practice would see in a middle aged individual."  (Tr. 349-51.)

### D.  The ALJ's Decision

The ALJ issued his decision on July 19, 2016, applying the five-step process described below, pursuant to 20 C.F.R. § 404.1520.  (Tr. 317-34.)  At Step One, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of April 13, 2011.  (Tr. 322.)  At Step Two, the ALJ found that Plaintiff suffered from cervical degenerative disc disease and bilateral shoulder degenerative joint disease.  (Id.)  At Step Three, ALJ Weiss determined that Plaintiff's impairments, alone or in combination do not meet or medically equal the severity of any of the regulation's listed impairments.  (Tr. 323.)  Specifically, ALJ Weiss considered Listings 1.00, 1.02, and 1.04.  (Id.)

ALJ Weiss then addressed Step Four, first considering Plaintiff's RFC.  An RFC determination identifies what work a claimant can still perform, despite his limitations.  See C.F.R. § 404.1545.  The ALJ determined that Plaintiff had the RFC to perform light work, that includes the ability to sit and to stand/walk six hours each in an eight-hour workday with normal breaks and lift/carry ten pounds frequently and twenty pounds occasionally. (Tr. 323-24.)  Plaintiff can frequently climb and balance, occasionally stoop, kneel and crouch, never crawl, frequently

push/pull, frequently reach with the dominant right upper extremity, and occasionally reach with the left upper extremity.  (Id.)

In considering Plaintiff's limitations, ALJ Weiss made various observations about Plaintiff's testimony and reviewed Plaintiff's medical records.  (Tr. 324-27.)  The ALJ found that the opinion of the Medical Board only concerned Plaintiff's ability to perform his work as a police officer and does not preclude the performance of all vocational activity.  The ALJ therefore afforded "little weight" to the opinion of the New York City Police Department's Medical Board.  (Tr. 324.)

The ALJ considered that Plaintiff had a series of diagnostic tests performed: an MRI of the cervical spine performed on September 27, 2011 revealed a small posterior herniated disc without bone impingement; an MRI of the right shoulder performed on September 27, 2011 showed a tiny partial thickness tear; EMG/NCV study performed on September 27, 2011 was normal; an MRI of the left shoulder performed on November 10, 2011 showed status post-rotator cuff repair and acromioplasty, an apparent tear of the infraspinatus and small subacromial bursal fluid collection; and an MRI of the left elbow performed on October 22, 2012 showed mild distal biceps tendinosis and no osseous abnormality or tendon or ligament tear.  (Tr. 324.)

ALJ Weiss found that the opinion of Dr. Parnes was not consistent with the objective diagnostic tests "which includes findings of 'small' posterior herniated disc 'without' cord impingement and 'mild' narrowing of the foramen, 'tiny' (1-2 mm) partial thickness tear, 'mild' biceps distal tendinosis and 'no' osseous abnormality, tendon or ligament tear with a normal EMG/NCV study."  (Tr. 324.)  The ALJ also found that the opinion of Dr. Parnes was not supported by the nature of the impairments characterized as sprains and strains or the "conservative care" received.  Accordingly, the ALJ afforded "little weight" to Dr. Parnes's opinion.  (Tr. 325.)

The ALJ also gave "little weight" to the opinion of Dr. Goldstein because it was inconsistent with the objective diagnostic tests, which include "mild findings suggesting less significant physical limitations." (Tr. 325-26.) Dr. Goldstein's opinion was also not supported by the nature of the impairments characterized and the "conservative care" received. (Tr. 326.) The ALJ noted that Dr. Goldstein and Dr. Parnes's opinions that Plaintiff was "totally" disabled are considered only for the fact they were stated and are entitled to no special significance. (Id.) The ALJ afforded "little weight" to the opinion of Dr. Kirschen because it was not supported by the mild diagnostic findings, conservative treatment, and treatment record that indicates good relief from medications. (Id.) ALJ Weiss gave the opinion of Dr. Caiati "some weight" because it was generally consistent with the exam findings, which include limitations in range of motion and full muscle strength and was based on a thorough examination. (Id.) The ALJ afforded "good weight" to the opinion of Dr. Parker[2] because it was consistent with and supported by the diagnostic tests and the "relatively conservative care received." (Tr. 327.)

The ALJ also considered Plaintiff's statements and testimony including that Plaintiff takes pain medication daily, uses a TENS machine, drives rarely, and that his wife does the shopping and all the household tasks. (Id.)

Based on his RFC determination, the ALJ concluded at Step Four that Plaintiff could perform his past relevant work as a police lieutenant, a skilled position requiring light exertional capacity. (Tr. 327-28.) Finally, ALJ Weiss relied on the testimony of the Vocational Expert ("VE") to determine at Step Five that there are also other jobs that exist in significant numbers in the national economy that Plaintiff can perform including as a counter clerk (60,000 jobs in the national economy), an information clerk (200,000 jobs in the national economy), a furniture rental

---

[2] ALJ Weiss incorrectly referred to Dr. Parker as "Dr. Kwok."

clerk (90,000 jobs in the national economy), and a surveillance system monitor (75,000 jobs in the national economy).  (Tr. 328-29.)  The vocational expert testified that these alternate jobs could be performed with one arm and the job of surveillance system monitor requires "no need for reaching at all."  (Tr. 360-61.)  Accordingly, the ALJ found that Plaintiff was not under a disability as defined in the Social Security Act from April 13, 2011 through the date of his decision.  (Tr. 329.)

## II. DISCUSSION

### A.  <u>Social Security Disability Standard</u>

Under the Social Security Act, "disability" is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual is disabled when his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

The Commissioner's regulations set out a five-step sequential analysis by which an ALJ determines disability.  20 C.F.R. § 404.1520.  The analysis is summarized as follows:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

<u>Burgess v. Astrue</u>, 537 F.3d 117, 120 (2d Cir. 2008) (second alteration in original) (quoting <u>Green–Younger v. Barnhart</u>, 335 F.3d 99, 106 (2d Cir. 2003)).  As part of the fourth step, the

Commissioner determines the claimant's RFC before deciding if the claimant can continue in his or her prior type of work.  20 C.F.R. § 404.1520(a)(4)(iv).  The claimant bears the burden at the first four steps; but at step five, the Commissioner must demonstrate "there is work in the national economy that the claimant can do."  Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009); see also Campbell v. Astrue, No. 12-CV-5051, 2015 WL 1650942, at *7 (E.D.N.Y. Apr. 13, 2015) (citing Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999)).

## B.  Scope of Review

In reviewing a denial of disability benefits by the SSA, it is not the function of the district court to review the record de novo, but instead to determine whether the ALJ's conclusions "'are supported by substantial evidence in the record as a whole, or are based on an erroneous legal standard.'"  Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (quoting Beauvoir v. Chater, 104 F.3d 1432, 1433 (2d Cir. 1997)).  Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  "'To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'"  Snell v. Apfel, 177 F.3d 128, 132 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).  Thus, the Court will not look at the record in "isolation but rather will view it in light of other evidence that detracts from it."  State of New York ex rel. Bodnar v. Sec. of Health and Human Servs., 903 F.2d 122,

126 (2d Cir. 1990).  An ALJ's decision is sufficient if it is supported by "adequate findings . . . having rational probative force."  Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).

## C. **Analysis**

Plaintiff puts forth two arguments in support of his appeal of ALJ Weiss's decision.  First, Plaintiff challenges ALJ Weiss's RFC determination, asserting that ALJ Weiss misapplied the "treating physician rule" by failing to give proper weight to the opinions of Plaintiff's treating physicians—Dr. Goldstein, Dr. Parnes, and Dr. Kirschen—and by failing to properly weigh the opinions of medical expert, Dr. Parker, and consultative examiner, Dr. Caiati.  (Pl. Mem. 19-23.) Second, Plaintiff argues that ALJ Weiss erred in finding that Plaintiff could return to his past work as a police lieutenant because the Medical Board determined that he could not perform the duties of his previous job, and because the job of police lieutenant requires occasional crawling and frequent reaching, which is inconsistent with ALJ Weiss's RFC determination.  (Pl. Mem. 24.) For the reasons set forth below, none of these arguments are availing.

### 1.  The ALJ Properly Weighed the Medical Assessments in the Record.

Plaintiff argues that, in making the RFC assessment, the ALJ erred by assigning "little weight" to the assessments of Plaintiff's treating physicians, Drs. Parnes, Goldstein, and Kirschen and, instead, assigning "some weight" to the assessment from consultative examiner Dr. Caiati and "good weight" to the assessment of medical expert Dr. Parker.

An RFC determination specifies the "most [a claimant] can still do despite [the claimant's] limitations."  Barry v. Colvin, 606 F. App'x 621, 622 n.1 (2d Cir. 2015) (summary order); see Crocco v. Berryhill, No 15-CV-6308, 2017 WL 1097082, at *15 (E.D.N.Y. Mar. 23, 2017) (stating that an RFC determination indicates the "nature and extent" of a claimant's physical limitations and capacity for work activity on a regular and continuing basis (citing 20 C.F.R. § 404.1545(b)).

In determining a claimant's RFC, "[t]he Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background, such as age, education, or work history." Crocco, 2017 WL 1097082, at *15; see also Barry, 606 F. App'x at 622 n.1 ("In assessing a claimant's RFC, an ALJ must consider 'all of the relevant medical and other evidence,' including a claimant's subjective complaints of pain.") (quoting 20 C.F.R. § 416.945(a)(3)).  An RFC determination must be affirmed on appeal where it is supported by substantial evidence in the record.  Barry, 606 F. App'x at 622 n.1.

### a.  Treating Physicians' Opinions

Plaintiff argues that the ALJ erred in assigning "little weight" to the treating physicians' opinions and that no substantial medical evidence contradicts their opinions.  (Pl. Mem. 19-20.) The Court finds that the ALJ provided "good reasons" for the "little weight" accorded to each of the opinions.

First, the ALJ properly stated that the opinions of Drs. Goldstein and Parnes that Plaintiff was "totally" disabled were considered only for the fact they were stated and are entitled to no special significance because the legal finding of disability is reserved for the commissioner.  (Tr. 326.)  See Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("[a] treating physician's statement that a claimant is disabled cannot itself be determinative").

Second, ALJ Weiss gave good reasons to justify the weight afforded to each of the treating physicians' opinions.  The ALJ explained that the opinion of Dr. Parnes was inconsistent with the objective diagnostic tests "which include[] findings of 'small' posterior herniated disc 'without' cord impingement and 'mild' narrowing of the foramen, 'tiny' (1-2 mm) partial thickness tear, 'mild' biceps distal tendinosis and 'no' osseous abnormality, tendon or ligament tear with a normal

EMG/NCV study." (Tr. 324.) The ALJ also found that the opinion of Dr. Parnes was not supported by the nature of the impairments characterized as sprains and strains or the "conservative care" received. (Tr. 325.) Similarly, ALJ Weiss explained that the opinion of Dr. Goldstein was inconsistent with the objective diagnostic tests, which include "mild findings suggesting less significant physical limitations, and was also not supported by the nature of the impairments characterized and the "conservative care" received. (Tr. 325-26.) The ALJ also found that the opinion of Dr. Kirschen was not supported by the mild diagnostic findings, conservative treatment, and treatment record indicating good relief from medications. (Id.) And, as explained below, the record also contained the contrary opinions of Dr. Parker and Dr. Caiati, which the ALJ credited to varying degrees. Accordingly, the ALJ properly weighed the opinions of the treating physicians.

### b.  Dr. Parker's Opinion

Plaintiff argues that it was error to for the ALJ to assign "good weight" to Dr. Parker's testimony because "it was superficial and did not consider all of [Plaintiff's] impairments." (Pl. Mem. 20-21.) Specifically, Plaintiff takes issue with Dr. Parker's testimony that he considered a "normal" EMG result, but did not hear Plaintiff's 2013 testimony that the EMG was not completed because he started bleeding due to his Von Willebrand's disease. Plaintiff argues that the EMG "only addressed the left upper extremity and is apparently incomplete." (Id.) He also takes issue with the fact that Dr. Parker's testimony did not mention evidence of a grade III acromioclavicular separation of the left shoulder. (Id.)

First, the report for the September 27, 2011 EMG and nerve conduction study does not indicate that the tests were stopped or incomplete due to bleeding. (Tr. 184-85.) The report showed "normal latencies, aptitudes, and conduction velocities," "no evidence of electrical instability" in "all examined muscles," and was a "normal left upper extremity/cervical

electrodiagnostic study." (Id.)  Furthermore, although Plaintiff seems to suggest that the test was incomplete because it "only addressed the left upper extremity," it appears that the test was only ordered for the left upper extremity with the report stating: "chief complaint . . . neck pain radiating to the left hand . . . the right upper extremity is asymptomatic." (Tr. 184.)  Therefore, Plaintiff's argument has no merit.  The discrepancies between the report and Plaintiff's testimony were a matter for the ALJ to resolve in determining the weight accorded to Dr. Parker's testimony.

Second, Plaintiff argues that it was error to give "good weight" to Dr. Parker's testimony because he did not mention that the Medical Board reviewed a May 18, 2009 x-ray of Plaintiff's left shoulder and found a Grade III acromioclavicular joint separation.  (Tr. 21, 250.)  However, Dr. Parker did explicitly state that he considered the more recent November 10, 2011 MRI of Plaintiff's left shoulder performed by Dr. Harkavy.  (Tr. 350.)  This MRI was performed after Plaintiff's left shoulder surgery on August 24, 2010.  Dr. Harkavy found that the left shoulder "appears to be status/post previous rotator cuff repair and acromioplasty," and as to the acromioclavicular joint, the MRI showed "mild acromioclavicular joint arthrosis." (Tr. 254.)  The fact that Dr. Parker did not explicitly state whether he considered the Medical Board's findings concerning the 2009 x-ray does not establish that the ALJ was required to give Dr. Parker's opinion less weight, especially since Dr. Parker considered the findings from a more recent MRI.  Furthermore, the ALJ provided "good reasons" for according Dr. Parker's opinion "good weight" finding that the opinion was consistent with and supported by the diagnostic tests and conservative care received.  (Tr. 327.)  Accordingly, the ALJ properly weighed the opinion of Dr. Parker.

### c.  Dr. Caiati's Opinion

Plaintiff argues that the ALJ erred in assigning "some weight" to Dr. Caiati's opinion because "the report of a one-time consultative examiner should not be assigned considerable

weight" and Dr. Caiati "reviewed none of the objective medical evidence regarding [Plaintiff's] spine, his shoulders, or his knee."  (Tr. 22-23.)

First, the opinion of a consultative examiner may constitute substantial evidence.  See Netter v. Astrue, 272 Fed. Appx. 54, 55-56 (2d Cir. 2008) (report of a consultative physician may override opinion of a treating physician, provided it is supported by substantial evidence in the record); Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011) (medical opinions of consultative examining physicians can constitute substantial evidence).  Dr. Caiati's opinion supports the RFC for light work with occasional reaching in the left upper extremity.  While Dr. Caiati found that Plaintiff had "minimal to moderate limitation right and left arms due to right and left shoulder pain" in reaching, pushing, and pulling, (Tr. 204), the ALJ properly relied on Dr. Parker's opinion that Plaintiff could frequently reach overhead with the right shoulder.  (Tr. 323-24, 347-48.) Where genuine conflicting evidence exists, the ALJ may exercise discretion in resolving the conflict.  Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Schaal, 134 F.3d at 504.  Further, an ALJ may consider and "choose between properly submitted medical opinions."  Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998).

Second, the ALJ gave "good reasons" for affording Dr. Caiati's opinion "some weight" stating that it was generally consistent with the examination findings, which include limitations in range of motion and full muscle strength and was based on a thorough examination.  (Tr. 326.) Plaintiff relies on Burgess, 537 F.3d at 132, and other cases citing Burgess, for the proposition that the opinion of a consultative examiner who did not review MRI findings cannot be considered substantial evidence.  (Pl. Mem. at 23.)  However, Burgess is clearly distinguishable.  In Burgess, the ALJ's decision largely relied on the opinion of a non-examining consultative physician who testified at the claimant's hearing that there was "no report of an MRI of the lumbar spine" in the

record and, thus, "no objective reason" why the claimant could not walk, sit, and stand for six hours. 537 F.3d, at 125, 130.  The Second Circuit did not view this opinion as substantial evidence because the non-examining physician and the ALJ both overlooked the MRI report in the record. Id. at 130 ("[T]he ALJ was unaware of the presence—and the contents—of the MRI Report, which was in the administrative record.").  While it is not clear from Dr. Caiati's opinion whether he reviewed Plaintiff's MRIs, the ALJ did not solely rely on Dr. Caiati's opinion in formulating the RFC.  As explained above, the ALJ also relied on the opinion of Dr. Parker who reviewed Plaintiff's medical records including the MRIs, and the ALJ specifically considered the MRIs in his decision.  Additionally, unlike the doctor in Burgess Dr. Caiati performed an examination of Plaintiff and as the ALJ noted his opinion was consistent with the examination findings.  (Tr. 326.) Accordingly, the ALJ properly weighed the opinion of Dr. Caiati.

Finally, to the extent Plaintiff argues that the ALJ erred in finding that Plaintiff could occasionally reach with his left upper extremity and frequently reach with his right upper extremity, this argument is rendered irrelevant by the fact that the ALJ identified jobs that could be performed with one arm and one job that required "no need for reaching at all."  (Tr. 328-29; 360-61.)

### 2. Even if the ALJ Erred at Step Four, He Made Additional Findings at Step Five and Therefore Remand is Not Warranted

Plaintiff argues that ALJ Weiss erred in finding that Plaintiff could return to his past work as a police lieutenant because the Medical Board determined that he could not perform the duties of his previous job, and the job of police lieutenant requires occasional crawling and frequent reaching, which is inconsistent with the RFC which found that Plaintiff could "never crawl" and "occasionally reach with the left upper extremity."  (Pl. Mem. 24.)  The Commissioner argues that even if the ALJ erred in finding that Plaintiff could perform the job of police lieutenant, the ALJ

also proceeded to Step Five and found that there were a significant number of jobs that an individual with Plaintiff's RFC could perform.  (Tr. 329, 360-61.)

The Court agrees with the Commissioner.  It was an error for the ALJ to find Plaintiff could return to his job as a police lieutenant, which according to the Dictionary of Occupational Titles requires occasional crawling and frequent reaching, when the RFC clearly stated that Plaintiff could "never crawl" and could only "occasionally reach" with the left upper extremity.  (Tr. 323-24.)  However, the ALJ also proceeded to Step Five to find that there were other jobs that exist in significant numbers in the national economy that Plaintiff could perform including jobs that can be performed with one arm (counter clerk, information clerk, and storage facility clerk) and the job of surveillance system monitor which requires "no need for reaching at all." (Tr. 358-61.)  The RFC found that Plaintiff could frequently reach with the right upper extremity and Plaintiff testified that he is righthanded.  (Tr. 323-24, 356.)  Therefore, these alternative jobs were consistent with the reaching limitations of the RFC.  "[E]ven if the ALJ erred at Step Four, his error would be harmless and would not warrant remand. The ALJ went on to Step Five, in the alternative, to consider whether [Plaintiff] could perform other work in the national economy. Because his determination at that step was proper, a different outcome at Step Four would do nothing to change the overall result." Roman Jimenez v. Colvin, No. 12-CV-6001, 2014 WL 572721, at *17 (S.D.N.Y. Feb. 13, 2014) (report and recommendation) adopted sub nom. Jimenez v. Colvin, No. 12-CV-6001, 2016 WL 5660322 (S.D.N.Y. Sept. 30, 2016).  Accordingly, remand here is not warranted.

## III.  CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's motion for judgment on the pleadings and GRANTS the Commissioner's cross-motion.  The Clerk of the Court is directed to enter judgment accordingly.

**SO ORDERED.**

Dated: November 30, 2020
Central Islip, New York

                                /s/ (JMA)                  
                             JOAN M. AZRACK
                             UNITED STATES DISTRICT JUDGE